IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**BRICE D. REAVES,**                          )
                                              )
                    Plaintiff,                )
                                              )
V.                                            )          Civil No. **05-596-CJP**[1]
                                              )
**JO ANNE B. BARNHART**[2],                   )
**Commissioner of Social Security,**          )
                                              )
                    Defendant.                )

## <u>ORDER</u>

**PROUD, Magistrate Judge:**

Pursuant to 42 U.S.C. § 405(g), plaintiff Brice D. Reaves is before the Court seeking review of the final decision of the Social Security Administration denying him Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, or even a Period of Disability (POD) pursuant to 42 U.S.C. § 416(i).  **(Doc. 1).**  In addition to submitting the administrative record **(Doc.  9 ("R."))**, plaintiff and defendant have fully briefed their positions.  **(Docs. 16 and 21).**

Plaintiff Reaves raises two specific issues:

1.      Whether the Administrative Law Judge improperly utilized a medical text in reaching her decision; and

2.      Whether the Administrative Law Judge failed to properly evaluate and weigh the fact that the Illinois Office of Rehabilitation Services provided plaintiff with a home assistant for 130.5 hours per month.

---

[1]Pursuant to 28 U.S.C. § 636(c), upon the consent of the parties, Chief U.S. District Judge G. Patrick Murphy referred this case to the undersigned Magistrate Judge for all further proceedings and order of entry of judgment.  **(Docs. 6, 11 and 12).**

[2]Plaintiff's complaint does not refer to the Commissioner of Social Security by name; this Court takes judicial notice that Jo Anne B. Barnhart is the current Commissioner.

Plaintiff also generally takes issue with the Administrative Law Judge's failure to recognize fibromyalgia as one of plaintiff's "severe" impairments.  From plaintiff's perspective, the Administrative Law Judge ignored evidence supporting a diagnosis of fibromyalgia and improperly "played doctor."

## Synopsis of the Procedural History and the Decision Under Review

In January 2001, plaintiff Brice D. Reaves applied for DIB, alleging the onset of disability as of June 30, 2000, due to fibromyalgia, high blood pressure, diabetes and "some depression."  **(R. 102-104 and 123).**

Administrative Law Judge ("ALJ") Tom D. Capshaw initially denied plaintiff benefits in November 2002, finding that plaintiff had "severe" fibromyagia, non-insulin dependent diabetes and depression, but remained capable of a limited range of light work..  **(R. 63-70).**  In December 2003 the Appeals Council vacated and remanded ALJ Capshaw's 2002 decision.  **(R. 88-90).**  The Appeals Council wanted the ALJ to obtain updated medical records and address: (1) plaintiff's subjective complaints and provide a rationale for the evaluation of plaintiff's symptoms, in accordance with Social Security Ruling 96-7p; and (2) obtain additional vocational evidence, pose hypotheticals and obtain specific analysis regarding the impact of plaintiff's limitations on his occupational base.  **(R. 88-90).**

The summary of the medical evidence contained in ALJ Capshaw's 2002 decision was incorporated by reference into ALJ Anne C. Pritchett's subsequent decision, issued May 18, 2004.  **(R. 23-32).**  Plaintiff was again found not disabled, with a residual functional capacity for a limited range of light work.  **(R. 30-32).**  ALJ Pritchett found that plaintiff suffered from "severe" diabetes mellitus, chronic kidney disease and bilateral carpal tunnel syndrome, but not

2

fibromyalgia.  **(R. 26, 28, 29 and 32).**  ALJ Pritchett did not find plaintiff credible with respect to the extent and severity of his exertional and nonexertional limitations.  **(R. 32).**  Based on plaintiff's age, education and transferrable skills, plaintiff was deemed not disabled, pursuant to Medical Vocational Rules 202.15 and 202.22 (20 C.F.R. Pt. 404, Subpt. P, App. 2).[3]  **(R. 31).** The ALJ further noted that despite the restricted range of light work, vocational expert Dr. Thomas D. Upton opined that plaintiff was still capable of performing light, semi-skilled work in the areas of motor vehicle and boat sales, appliance sales, and home furniture sales– all jobs available by the thousands in the regional economy. **(R. 31).**

In making her decision, ALJ Pritchett relied in particular on Dr. Paul Juergens' January 2001, opinion that plaintiff had probable fibromyalgia, and Dr. Baker's similar diagnosis in June 2003.  **(R. 27, 29, 284 and 362).**  A medical article about fibromyalgia was also cited in the decision:

> The claimant has also alleged that he suffers from fibromyalgia. The American College of Rheumatology established criteria in 1990 for the diagnosis of this condition. The criteria included widespread pain present for at least three months. Pain is considered widespread when a patient has pain in ***both*** sides of the body and has pain above ***and*** below the waist. There must be pain in 11 of 18 specified tender point sites upon digital palpation. To qualify, a tender point has to be painful at palpation, and not just "tender." F. Wolfe, ***et al., Arthritis and Rheumatism***, Vol. 33, No. 2, Feb. 1990. Since there is no concrete diagnostic test to confirm the existence of this condition, the diagnosis is based largely upon an individual's subjective complaints. Although the claimant has alleged severe pain, which he attributes to this condition, treatment records consistently document only "tenderness" at various tender point sites, rather than "pain" on palpation (Ex. 10F, pp. 9-12 & 15 & 14F, pp. 4, 8, 11, 14, 16 & 18). The evidence, as

---

[3]At the date of onset, June 30, 2000, plaintiff was 48 years old and characterized as a "younger" individual, but when he turned 50 on March 1, 2002, his age classification changed to "closely approaching advanced age." ***See*** **20 C.F.R. 404.1563 ("younger" claimants' age is not considered a factor in the ability to adjust to other work, but after one turns 50 years old, age becomes a factor to be considered).**

outlined in the body of the decision, supports a conclusion that the claimant's arthralgias are also "non-severe."

**(R. 26 (emphasis in the original)).**

With respect to the home assistant provided by the Illinois Office of Rehabilitation Services, ALJ Pritchett gave "little weight" to the fact that plaintiff was approved for such assistance.  **(R. 28).**  The ALJ found the types of assistance purportedly needed and/or provided by the assistant to be inconsistent with evidence in the record.  **(R. 28).**  The ALJ also found it "noteworthy" that plaintiff's qualification for a home assistant was based on multiple diagnoses, some of which the ALJ found problematic.  **(R. 28).**

Plaintiff's request for review was denied by the Appeals Council on July 1, 2005, making ALJ Pritchett's decision the final decision of the Commissioner.  **(R. 7-9).**  Consequently, this matter is subject to review by the District Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

### The General Scope of Review

The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 1382, et seq., and 20 C.F.R. pt. 404.  This Court reviews the decision denying plaintiff benefits to ensure that the ALJ's decision is supported by substantial evidence, and that no mistakes of law were made. ***See* 42 U.S.C. § 405(g).**

As a preliminary matter, to be eligible for DIB, a claimant must be disabled during the time he was insured for benefits.  ***See* 42 U.S.C. §§ 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.131.**

To qualify for DIB a claimant must be "disabled."  "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. § 423(d)(1)(A).**

4

A "'physical or mental impairment' is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." **42 U.S.C. §§ 423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. ***See Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);** *see also* **20 C.F.R. §§ 404.1520(b-f).**

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** Thus, the Court must determine not whether plaintiff is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made. ***See Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).** The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence" the entire administrative record is taken into

5

consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).** Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence. ***Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993).**

A negative answer at any point in the five step analytical process, other than at the third step, stops the inquiry and leads to a determination that the claimant is not disabled. ***Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).** If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three). If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Secretary at step four to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir.1984).**

### Synopsis of Relevant Evidence

Plaintiff Reaves was born March 1, 1952, and, as previously noted, was 48 years old at the alleged onset of disability, June 30, 2000, and 52 years old when the final decision denying his application for DIB was affirmed. Plaintiff has a college degree, and he last worked as a district sales manager for a seed company. **(R. 489).** Plaintiff alleges disability as of June 30, 2000, the last date he worked, although he also indicated he began having physical difficulties in approximately January 2000. **(R. 123).** According to plaintiff, his employer "downsized" at the same time he was having physical trouble doing his job duties, so they had a "parting of the ways." **(R. 492 and 524-525).**

The first relevant medical record reflects that on July 22, 1999– eleven months before his onset date– plaintiff requested medication for what he perceived to be arthritis, and what Dr.

Russell Brown thought was probably degenerative joint disease.  **(R. 215).**  Records from January and February, 2000, indicate plaintiff was feeling well overall; not only was plaintiff's arthralgia/myalgia stable with medication, but his hypertension was "well controlled" with medication and home monitoring.  **(R. 192 and 214).**  However, in October 2000 plaintiff complained that medication was no longer helping his degenerative joint disease, and he was having difficulty walking.  **(R. 212-213).**  At that time, plaintiff was considered to have not only hypertension and degenerative joint disease, but also anxiety.  **(R. 213).**  Dr. Brown prescribed Vioxx and directed plaintiff to return in six months.  **(R. 213).**

In November 2000, plaintiff was hospitalized for two days due to hypoglycemia, and he was diagnosed with non-insulin dependent diabetes mellitus, which was stabilized by the time of discharge.  **(R. 200-201).**   At that time, plaintiff's recurrent joint pain was noted, but he had a full range of motion in all extremities.  **(R. 202-203).**  Plaintiff's blood pressure was stable.  **(R. 202).**  A history of "mild" anxiety was noted in the hospital records, and it was reported that plaintiff had started drinking again, but purportedly not to excess.  **(R. 202).**

In January 2001, Dr. Juergens, of Southern Illinois Pain Management, saw plaintiff regarding his excessive joint pain, which plaintiff reported had worsened over the past seven to eight months, and which was characterized as 4-5 on an upward-sliding 10 scale– a constant ache all over.  **(R. 285-286).**  Dr. Juergens found that plaintiff had a good range of motion and good grip strength, but he was tender at 10 of 18 of the tender points.  **(R. 284 and 286).**  Darvocet, Vioxx and Tylenol # 3 were not relieving plaintiff's pain.  **(R. 285).**  Dr. Juergens noted that Dr. Pfalzgraf did not think plaintiff suffered from inflammatory arthropathy; rather, he possibly had "mild" fibromyalgia.  **(R. 284).**  Dr. Juergens opined:  "He does not quite meet the

full diagnosis of fibromyalgia, but the lack of any other alternative makes this the most likely etiology." **(R. 284).**  Plaintiff began physical therapy and he was also given a TENS unit for his back and shoulder.  **(R. 217).**  His therapist's notes from January and February 2000 indicate plaintiff rated his pain as 6 on a 10 scale, and fatigue was an additional limiting factor.  **(R. 217 and 219).**

In April 2001 plaintiff was hospitalized for approximately a week for hyponatremia and associated confusion; alcohol abuse was considered a factor.  **(R. 222-224).**  This condition was resolved by the time plaintiff was discharged.

In June 2001 Dr. Raymond Leung performed a consultative exam and recorded that plaintiff reported that he experienced pain at his knees, elbows, and shoulders, which he rated as 9 on a 10 scale.  **(R. 263-266).**  The doctor found plaintiff was tender at all trigger points.  **(R. 265).**  Plaintiff indicated he needed a cane, and Dr. Leung observed that plaintiff was able to toe walk, but unable to heel walk, and if plaintiff did not use a cane he "waddled."  **(R. 265).** Plaintiff could squat half way, and he had no trouble getting on and off the exam table, and his leg strength was 4 on a 5 scale.  **(R. 265).**  Plaintiff reported that he was able to sleep only five or six hours per night.  **(R. 265).**  It was also noted at that time that plaintiff's blood pressure and diabetes were controlled.  **(R. 266).**

Two consultative psychological examinations and a mental residual functional capacity assessment at this same time, June 2001, indicated signs of depression, resulting in only "moderate" limitations on his daily activities, social functioning, and his ability to maintain concentration, persistence and pace.  **(R. 174-189).**  Plaintiff's sleep difficulties were described as improved with medication.  **(R. 270).**  Plaintiff was diagnosed as having depression,

8

secondary to his general medical condition, and a pain disorder with psychological factors.  **(R. 271).**

Dr. Juergens' notes from May through August 2001 describe plaintiff's pain as generally hovering around 8 on a 10 scale– once as high as 10.  **(R. 272, 275, 276 and 280).**  However, Dr. Juergens also noted that in August plaintiff reported his pain had increased after he helped to get a house in order for his brother to move into.  **(R. 272).**  Plaintiff had 16 of 18 tender points and 6 of 6 control points, although he continued to maintain full strength in all extremities.  **(R. 272).** Depression was also present.  **(R. 272).**  Plaintiff was prescribed Paxil, Doxepin, Topamax and Methadone.  **(R. 272).**  Dr. Glen Wishterman performed a consultative exam in July 2001; the listed primary diagnosis was hypertension; the secondary diagnosis was diabetes; and alleged fibromyalgia was also noted.  **(R. 166).** Dr. Wishterman considered plaintiff capable of lifting 20 pounds occasionally and 10 pounds frequently, standing/walking/sitting for six hours out of an eight hour work day, and ultimately being capable of performing light work with occasional postural limitations.  **(R. 167-168).**   It was in August 2001 that the Illinois Office of Rehabilitation Services accepted plaintiff into its Home Service Program, assigning an assistant to work 113.5 hours per month, assisting plaintiff with bathing, grooming, dressing, meal preparation, laundry, housework and shopping. **(R. 287).**  A Home Service Report from October indicates plaintiff was independently mobile without any assistive device. **(R. 478).**  By November, 125 hours per month of assistance was authorized, due to multiple impairments, including "severe" fibromyalgia and recent additional diagnoses of depression and

encephalopathy[4].  **(R. 288 and 478).**  Dr. Juergens notes from this same time period, September through November 2001, indicate plaintiff was serving as a care-giver for his brother.  **(R. 304 and 308).**  Plaintiff reported that his pain was 5-6 on a 10 scale.  **(R. 304).**  In December 2001 Dr. Brown noted that plaintiff's blood pressure was elevated, and plaintiff was complaining of fatigue and blurred vision.  **(R. 210).**  At that time, the doctor observed that plaintiff was able to ambulate without difficulty.  **(R. 210).**  Plaintiff was continued on Vioxx.  **(R. 210).**

Dr. Kyaw Naing, of the Carbondale Family Practice Clinic, recorded in January and February 2002 that plaintiff's diabetes was poorly controlled. **(R. 350-351).**  By March 2002, plaintiff's hypertension was also not satisfactorily controlled.  **(R. 344).**  In March, Dr. David Sullivan diagnosed plaintiff with plantar fasciitis and prescribed orthotics, which plaintiff reported relieved his foot pain and the doctor thought was resolving the problem.  **(R. 290-291).** Notes from April and May 2002, reflect that the orthotics continued to aid plaintiff to the point where he described this foot pain as "not too bad."  **(R. 444).**

Dr. Juergens' notes from March 2002 reflect that plaintiff's pain was 6 on a 10 scale, plaintiff felt physical therapy was helping, but he had not been sleeping well since a medication change, and he continued to be depressed, particularly since he had a friend pass away and he was in financial trouble.  **(R. 298).** Plaintiff also described spending time on the computer.  **(R. 298).**  By April 2002, according to Dr. Gupta, plaintiff's pain had increased a bit, up to 8 on a 10 scale, and he was found to be tender to palpation at 9 of 18 tender points.  **(R. 297).**  Dr. Gupta's notes from May 2002 show improvement; plaintiff rated his pain as only 3 on a 10 scale, which

---

[4]The Court was unable to find any medical records mentioning or diagnosing encephalopathy.  However, Dr. Naing or his office apparently listed the ailment on an Office of Rehabilitation Services forms.  **(R. 478).**

he attributed to the combination of Methadone and Gabitril.  **(R. 295).**  Nevertheless, Dr. Gupta indicated plaintiff was tender to palpation at 10 of 18 fibromyalgia tender points.  **(R. 295).**

In May 2002 plaintiff had cataract surgery and lens placement in both eyes.  **(R. 318 and 322).**

Dr. Gupta saw plaintiff at Southern Illinois Pain Management in late June 2002; plaintiff rated his pain as 6 on a 10 scale, and he was found to have 13 of 18 tender points.  **(R. 292).**  Plaintiff also reported experiencing a panic attack and continued depression, for which he was prescribed Wellbutrin, instructed to use breathing techniques, and also told to attend a fibromyalgia support group.  **(R. 293).**

Plaintiff testified before ALJ Capshaw in August 2002.  **(R. 484-516).**  Plaintiff complained of difficulty walking, swelling in his legs and feet, and constant pain– mostly in legs, lower back, shoulders and neck.– which he rated at 7-8 on a 10 scale.  **(R. 495-497).**  He also described having trouble sleeping, short term memory problems, dizziness, nausea, depression, and difficulty concentrating.  **(R. 493, 498 and 507).**  Plaintiff's blood pressure was under control with medication.  **(R. 499).**

During his testimony plaintiff estimated that he could stand for no more than 30-40 minutes at a time, and sit for 30-45 minutes, but he did not think he was capable of alternating between sitting and standing throughout a workday on a consistent basis.  **(R. 500-501).**  Plaintiff also though himself capable of walking 1-1 ½ blocks, and lifting up to 20 pounds occasionally.  **(R. 502-503).**  Plaintiff indicated that sometimes he can tend to his own personal care, such as dressing and bathing, and other times he needs assistance.  **(R. 503).**  Plaintiff was still driving, and he had taken trips as far as 90 miles.  **(R. 504).**  Plaintiff explained that he liked gardening,

but he "pays for it" afterward, and he has now stopped gardening. **(R. 499 and 506).** Plaintiff also indicated he had "cut way back" on dancing and going to the Moose Lodge. **(R. 499).** Plaintiff indicated he had attempted work as a telemarketer, but had not been able to do it. **(R. 508).** At the August 2002 hearing, vocational expert John Grenfell opined that the skills plaintiff had used in his prior job were transferable to light work. **(R. 512).** Depending on plaintiff's residual functional capacity, Grenfell considered plaintiff capable of unskilled, entry-level jobs; or, if plaintiff's testimony were found fully credible, then Grenfell did not think there was any work plaintiff could perform on a consistent basis. **(R. 514-515).**

After ALJ Capshaw denied plaintiff's application for DIB in November 2002, plaintiff sought individual mental health counseling through St. Mary's Hospital's outpatient clinic (he was already receiving group counseling). **(R. 464-468).** Plaintiff admitted having used cannabis a couple of days before for pain, and he indicated he smoked it up to two times per month, depending on his pain. **(R. 465).** Plaintiff also had a prescription for Viagra. **(R. 466).** Plaintiff described constantly experiencing pain all over his body, which he rated as 6-8 on a 10 scale. **(R. 467).** Plaintiff's GAF score was gauged at 50. **(R. 468).** The number of hours of home assistance allotted to plaintiff was also increased to 128 hours per month. **(R. 475).**

In February 2003, Dr. Cowart of the Carbondale Clinic observed that plaintiff's chronic kidney disease (stemming from using alcohol and Advil years ago) had progressed over the past year, apparently in association with hypertensive nephropathy, as plaintiff's hypertension was not properly controlled. **(R. 374-376).** It was noted that plaintiff had not been faithful to dietary sodium restrictions. **(R. 374).**

In March 2003, Dr. Juergens recorded that plaintiff's activities of daily living had

12

improved with Methadone, and plaintiff had been gardening, albeit with increased pain.  **(R. 426).**  Physical examination revealed 14 of 18 tender points.  **(R. 426).**  Plaintiff was seen at the Neuromuscular Orthopaedic Institute in June 2003.  **(R. 362-368).**  Plaintiff was complaining of increased pain, even on minimal activity, particularly in his hands and feet.  **(R. 362).**  At that time, 18 of 18 trigger points were tender, and it was thought that plaintiff had "probable fibromyalgia."  **(R. 362).**  Dr. Alam, a neurologist, noted that an EMG test was consistent with moderately severe bilateral carpal tunnel syndrome, and mixed sensory motor peripheral polyneuropathy involving the lower extremities– probably related to diabetes.  **(R. 369-370).**

In July 2003, plaintiff again reported gardening, and he indicated he needed no assistance with feeding himself, grooming, toiletry, homemaking, bathing, dressing and taking his medications.  **(R. 416).**  Plaintiff rated his pain as 5-6 on a 10 scale.  **(R. 416).**  Also in July, plaintiff was diagnosed with sleep apnea and prescribed a CPAP machine.  **(R. 386).**  In October, Dr. Naing diagnosed plaintiff as having a low testosterone level for which medication was prescribed.  **(R. 383).**

Dr. Naing's notes from January 2004 indicate plaintiff was experiencing hip pain, exacerbated by prolonged sitting or standing, or ambulation.  **(R. 405).**  Plaintiff rated his pain as 7-8 .  **(R. 405).**  Plaintiff's continued depression was also noted.  **(R. 405).**  In February 2004, Dr. Richard George spoke to plaintiff about "his diagnosis of fibromyalgia and the lack of a consistent concrete diagnostic criteria for the disorder," noting that plaintiff carried a "soft diagnosis" of fibromyalgia.  **(R. 403-404).**

In March 2004, plaintiff reported episodic breakthrough pain, particularly in his hips and legs, attributed to increased activity.  **(R. 401).**  According to plaintiff, his pain was 7 on a 10

13

scale.  **(R. 401).**  Full muscle strength was noted.  **(R. 401).**  Plaintiff explained that he takes care of his brother.  **(R. 401).**  From a psychological standpoint, plaintiff was depressed, experiencing panic attacks, had low energy, and complained that he had poor memory and concentration.  **(R. 451).**  However, in April 2004, plaintiff reported to his psychologist that he was "ok" and could not complain too much.  **(R. 448).**

In May 2004, plaintiff testified before ALJ Pritchett.  **(R. 517-561).**  Plaintiff stated that he takes 13 medications, and some cause dizziness and fatigue, causing him to doze-off for 20-30 minutes almost daily.  **(R. 525-526).**  Plaintiff explained that his cane was not prescribed, but it was "highly recommended to help his balance, as he has fallen.  **(R. 526).**  According to plaintiff, fibromyalgia, his principal complaint, particularly affects his hips, heels and  hands, and he has nerve damage in his hands and feet.  **(R. 527).**  Plaintiff described experiencing constant deep aching pain, and some stabbing pain, which he rated as 7-9 on a 10 scale, and which completely laid him up approximately 15-20 days per month.  **(R. 528-529).**  Plaintiff also stated that he experienced heel pain ranging from 5-8 on a 10 scale, and it was 7-8 on 15-20 days per month.  **(R. 531).**  Carpal tunnel syndrome is also painful, and causes him to drop things.  **(R. 532).**  Surgery was being contemplated for carpal tunnel syndrome.  **(R. 528).**

Plaintiff described his depression as improved with medication.  **(R. 529).**  With respect to sleep apnea, plaintiff indicated that with the CPAP machine he could sleep for 3-4 hours, but pain awakens him, so he still nods off during the day.  **(R. 532-533).**  Plaintiff reported his diabetes is uncontrolled.  **(R. 530).**  According to plaintiff, he urinates frequently, 15-20 times per day.  **(R. 527).**  Plaintiff stated that he had acute renal failure and it would not be many years before he would need dialysis, or even a transplant– maybe 2-3 years.  **(R. 532-533).**

14

By plaintiff's own account, he could stand for 10-15 minutes without a cane, and 25-30 minutes with a cane, and he could sit for 15-20 minutes at a time. **(R. 535-536).** He stated that he could only walk 30 feet, or so without a cane, and a half block using a cane. **(R. 538).** Plaintiff was still able to drive, but only for 20-30 miles. **(R. 539).** Plaintiff indicated he no longer could push and pull things, due to shoulder pain. **(R. 538).** Gardening was no longer an option for plaintiff, and using a computer hurt his hands, but he still read and watched television. **(R. 543-544).** Plaintiff testified that he was currently authorized a State home assistant for 130.5 hours per month. **(R. 535).** The assistant helped plaintiff with getting dressed and some bathing. **(R. 535).**

Plaintiff clarified that he did not actually take care of his brother; rather, he visits him and plaintiff's home assistant takes care of the brother, a right-side stroke victim who uses a wheelchair. **(R. 545).** Plaintiff was unable to say how many hours the assistant worked with his brother, over and above the 130.5 hours he/she works with plaintiff . **(R. 545).** Plaintiff also explained that his 92 year old father lived with him and his wife, and plaintiff's wife cares for plaintiff's father. **(R. 546).** Plaintiff also clarified that he only tried marijuana once or twice for pain management. **(R. 547).**

Vocational expert Dr. Thomas Upton testified that plaintiff could not perform his prior work, which was classified as "heavy" (because it involved lifting large bags of seed) and skilled, but plaintiff's job skills were transferable to "light" work. **(R. 552).** Multiple hypotheticals were posed to Dr. Upton. **(R. 552-560).** The first hypothetical was based on a person of plaintiff's age and with his education, work experience and skills, who could lift 20 pounds occasionally, 10 pounds frequently, stand for six hours out of an eight hour work day, sit

for two hours and occasionally perform postural activities, and could grasp and finger frequently but not constantly.

**(R. 552).**  Dr. Upton opined such a person could work in semi-skilled light jobs, such as motor vehicle and boat sales, appliance sales and home furniture sales.  **(R. 552-553).**  If one had to be able to sit or stand at will, then those jobs would *not* be available.  **(R. 553 and 559).**  If one needed a sit/stand option, and *could* use their fingers and grasp frequently, Dr. Upton thought such a person could work as a sales counter clerk or  parking lot attendant– jobs which are available by the tens of thousands.  **(R. 553-554 and 559).**  However, if the fingering and grasping limitations still apply, along with the sit/stand at will option, then those clerk and attendant jobs would no longer be available– *no* jobs would be available. **(R. 558 and 559).**  If the grasping and fingering limitation is entirely taken out of the first hypothetical, then such a person could also work at assembler jobs; there are 37,000 such light jobs, and 8,500 sedentary jobs.  **(R. 554).**  Hand-packing jobs at the light level would also be available, of which there are 12, 900, and there are 240 such jobs at the sedentary level.  **(R. 554).**  Adding a sit/stand option to those jobs would cut their availability by half.  **(R. 555).**  However, if plaintiff were found totally credible, then there are no available jobs because he could not complete a standard work day, his carpal tunnel neuropathy would limit his fine and gross manipulation, his pain would also cause him to miss too much work and inhibit his ability to focus and concentrate, and his medications would cause problems if he nods off as described.  **(R. 555-556).**

### <u>Analysis</u>

Although plaintiff has raised only two discreet issues, the Court will generally utilize the five step analytical framework to put these issues in context.  Both plaintiff and defendant have

16

included such a general review in their respective briefs, and therefore there is no need for additional notice and briefing.

For purpose of step one in the five step analytical framework, there is no dispute that plaintiff is unemployed.

At step two, regarding whether plaintiff has any "severe" impairments, plaintiff takes issue with the exclusion of fibromyalgia, particularly since fibromyalgie was included as one of plaintiff's impairments in the initial decision, which was reversed and remanded on other grounds. An impairment or combination of impairments are not "severe" if they do not significantly limit the claimant's physical or mental ability to do basic work activities. **20 C.F.R. § 404.1521(a).** More important, an impairment must be demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. § 423(d)(3).** ALJ Pritchett began his analysis of plaintiff's claim of fibromyalgia by citing the American College of Rheumatology criteria for such a diagnosis. The ALJ then focused on the requirement that there be pain in 11 of 18 tender points upon palpation, not just tenderness. The ALJ also acknowledged that diagnosis is based largely upon subjective complaints **(R. 26)** – just as Dr. George had explained to plaintiff when they discussed plaintiff's "soft diagnosis" of fibromyalgia in February 2004 **(R. 403-404)**.

Citing *Baker v. Barnhart*, 2003 WL 21058544 (N.D.Ill. 2003), plaintiff asserts: "It is well settled in the Seventh Circuit that an ALJ may not resolve an issue by citing medical texts as the authority without proffering the evidence first to the plaintiff for review and comment." **(Doc. 16, pp. 5-6).** *Baker* relies on The Hearings, Appeals and Litigation Law Manual ("HALLEX"), Chapter I-2-825, for that proposition that medical texts may be used for

17

definitions, but not as authority for resolving substantive issues.  HALLEX is a guide for procedural rules in Social Security DIB cases.  With all due respect to U.S. Magistrate Judge Ashman, the author of the *Baker* order, the order is unpublished and not a controlling precedent. Furthermore, as best as this Court can tell, the Court of Appeals for the Seventh Circuit has not opined on whether HALLEX is binding.  ***See Cromer v. Apfel*, 234 F.3d 1272 (7th Cir. 2000) (unpublished opinion cited only for its discussion of HALLEX).**  With that said, plaintiff's argument is not well taken.

ALJ Pritchett's citation to the diagnostic criteria for fibromyalgia merely helps explain that fibromyalgia is a relatively amorphous diagnosis, and aides in "separating the wheat from the chaff" when reviewing the myriad of medical notes recording plaintiff's subjective complaints and doctors' observations.  The ALJ's analysis of the fibromyalgia issue makes clear that the ALJ was relying on: (1) plaintiff's testimony not being credible; (2) treatment records; and (3) medical opinions that clearly reflect that even plaintiff's own physicians were not certain that he had fibromyalgia.  **(*See* R. 26-27).**  In January 2001, six months after the alleged onset date, Dr. Juergens stated that plaintiff did not meet the criteria for fibromyalgia, even though that was the most likely etiology of his symptoms.  **(R. 284).**  In June 2003, three years after the alleged onset date, a fibromyalgia diagnosis was still speculative.   "[P]robable fibromyalgia" was recorded, even though 18 of 18 tender points were found.  **(R. 362).**  The diagnostic criteria cited by plaintiff certainly helps a layman understand why the diagnosis was still being debated, despite plaintiff having 18 of 18 tender points.  Even as late as February 2003, Dr. George described plaintiff as having a "soft diagnosis" of fibromyalgia.  **(R. 404-404).**

It is not ALJ Pritchett "playing doctor" and diagnosing plaintiff, but instead plaintiff's

own doctors' opinions that are the basis in the record for not finding that plaintiff had fibromyalgia.  It is not this Court's prerogative to reweigh the evidence, only to recognize that there is a sound basis in the record for the ALJ's finding regarding fibromyalgia.  Therefore, the ALJ's citation to the diagnostic criteria for fibromyalgia without affording plaintiff an opportunity for review and comment was not the per se reversible error plaintiff suggests, particularly in light of the aforementioned evidence.  For purposes of step two, plaintiff's severe impairments were limited to diabetes mellitus, chronic kidney disease and bilateral carpal tunnel syndrome.

It is undisputed that the aforementioned severe impairments, individually or in combination, do not meet or equal one of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Therefore, the Court finds no error at step three in the analytical process.

Steps four and five in the analytical process, regarding whether plaintiff can perform his past work or other work, hinge on plaintiff's residual functional capacity.  ALJ Pritchett concluded plaintiff retained a limited range of light work.  **(R. 30-32).**

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

**20 C.F.R. § 404.1567(b).**

Plaintiff does not take issue with the residual functional capacity per se.  Rather, plaintiff

19

contends that ALJ Pritchett erred in evaluating plaintiff's Home Services assistance plan, and the fact that his plan had increased from 113.5 hours per month to 130.5 hours per month at the time of the May 2004 hearing.  Plaintiff argues: "The ALJ gave very little weight [to the Home Services plan] due to supposed inconsistencies in the record, including her opinion that the plaintiff did not have the severe impairment of fibromyalgia.  An ALJ is not permitted to play doctor."  **(Doc. 16, p. 6).**

The Court has already found that ALJ Pritchett was not playing doctor when she concluded plaintiff did not have the severe impairment fibromyalgia; she was merely reflecting the medical opinions of the doctors who had examined plaintiff.  Discounting the fact that plaintiff had been assigned a home assistant, and that more hours had been authorized over time, can hardly be characterized as "playing doctor," since the Office of Rehabilitation Services' Home Service Program is certainly not an acceptable medical opinion.  ***See* 20 C.F.R. § 404.1513 (Medical and Other Evidence of Impairment), and § 404.1527 (Evaluating Opinion Evidence).**

The ALJ specifically addressed the home assistance provided by the State, as instructed by the Appeals Council; and there is an evidentiary basis in the record for discounting the fact that plaintiff was given a home assistant, and for concluding plaintiff is not credible.  In August 2001, 14 months after the onset of disability date, a home assistant was assigned to help plaintiff with bathing, grooming, dressing, meal preparation, laundry, housework and shopping. **(R. 287).** However, at this same time Dr. Wishterman considered plaintiff capable of lifting 20 pounds occasionally and 10 pounds frequently, standing/walking/sitting for six hours out of an eight hour work day, and ultimately being capable of performing light work with occasional postural

20

limitations. **(R. 167-168).** And, plaintiff described having helped get a house in order for his brother to move into **(R. 272)**, which is hardly consistent with not being able to perform the basic activities of daily living.

The number of hours of assistance was increased from 113.5 to 125 in November 2001, due to a new diagnosis of encephalopathy and depression, and based on a diagnosis of severe fibromyalgia. **(R. 288 and 478).** The Court has been unable to find any medical records mentioning or diagnosing encephalopy and, as discussed above, there is no actual diagnosis of severe fibromyalgia. Also, at that time plaintiff commented about serving as a caregiver for his brother **(R. 304)**, which contradicts the notion that he needed assistance himself. It was only at the second hearing that plaintiff attempted to explain that when he had reported caring for his brother he meant that he had merely visited him **(R. 545)**.

In July 2003, plaintiff reported gardening, and indicated he needed no assistance with feeding himself, grooming, toiletry, homemaking, bathing, dressing and taking his medications. **(R. 416).** In March, 2004, although breakthrough pain was reported, it was attributed to plaintiff's *increased* activity. **(R. 401).** One month later, in April 2004, plaintiff reported that he was "ok" and could not complain too much. **(R. 448).** Nevertheless, at that same time plaintiff was allotted even more hours of home assistance, up to 130.5 hours per. **(R. 535).** Also in apparent contradiction to the aforementioned medical notes, at the May 2004, hearing, plaintiff described experiencing constant deep aching pain, and some stabbing pain which completely laid him up approximately 15-20 days per month. **(R. 528-529).** Plaintiff also testified that he would need kidney dialysis or even a transplant, despite there being no such medical opinion in the record.

Furthermore, plaintiff's own testimony causes a reasonable person to question why plaintiff is authorized home assistance.  According to plaintiff, he lives with his wife and 92 year old father, and his wife cares for his father while the home assistant cares for him.  **(R 546).**  It is odd that plaintiff was authorized additional hours of home assistance (130.5 hours) contemporaneous with his brother, the victim of a stroke who is in a wheelchair, moving in next door, and his 92 year old father moving in after he was injured in an accident.  **(R. 545-546).**  According to plaintiff, his home assistant also cares for his brother, but plaintiff could not say for how many hours, which would be over and above the approximately 32.5 hours per week the assistant works for plaintiff.  **(R. 545).**

Relative to the analysis at step 4, there does not appear to be any dispute that plaintiff can no longer perform his past work, which was characterized as "heavy" work.  Step 5 addresses the crucial question of whether plaintiff can perform any other type of work.  As noted above, there is sufficient cause for the ALJ finding that plaintiff was not credible, which dramatically affects the residual functional capacity assessment.  In any event, plaintiff has not challenged the credibility ruling.

Even by plaintiff's own account, in May 2004,  he could stand for 10-15 minutes without a cane, and 25-30 minutes with a cane, and he could sit for 15-20 minutes at a time.  **(R. 535-536).**  He also stated that he could only walk 30 feet, or so without a cane, and a half block using a cane.  **(R. 538).**  Thus, there is evidence to the effect that plaintiff remains capable of the basic exertional requirements of light work, albeit a restricted scope of light work due to only being able to perform postural activities occasionally, and grasping and fingering frequently, but not constantly.  **(R. 552-553).**  Based on that assessment, vocational expert Upton opined that semi-

skilled light jobs, such as motor vehicle and boat sales, appliance sales and home furniture sales would comport with that vocational profile.  **(R. 552-553).**  Plaintiff does not take issue with Upton's testimony.  Therefore, plaintiff was properly found to be not disabled under the five-step framework and applicable regulations.

      **IT IS THEREFORE ORDERED**, for the aforestated reasons, the Commissioner's decision denying plaintiff Brice D. Reaves' application for Disability Insurance Benefits or a Period of Disability should be affirmed in all respects.  The Clerk of Court shall enter judgment accordingly, in favor of the defendant and against the plaintiff.

      **IT IS SO ORDERED.**

      **DATE:  September 28, 2006**

        **s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**